## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 7 |
| ROBERT S. VITOGIANNIS | ) | |
| | ) | Case No. 08 B 04144 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| HELLENIC ENTERPRISE I, INC., and | ) | |
| KONSTANTINOS D. ANTONIOU, | ) | Hon. Susan Pierson Sonderby |
| | ) | |
| Plaintiffs, | ) | Adv. No. 08 A 00315 |
| v. | ) | |
| | ) | |
| ROBERT S. VITOGIANNIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant's Motion to Dismiss the Second Amended Adversary Complaint (the "Complaint") filed by Plaintiffs herein. For the reasons set forth below, the motion will be granted, but only with respect to Plaintiff Antoniou as to Count II; the motion will be denied in all other respects.

Unless otherwise indicated, the following facts are taken from the Complaint and are assumed to be true for purposes of the motion to dismiss, all reasonable inferences being drawn in Plaintiff's favor. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008).

Robert S. Vitogiannis, the defendant in this adversary proceeding and Debtor in this

bankruptcy case ("Debtor"), became friends with Plaintiff Konstantinos Antoniou ("Antoniou") in 2004. Shortly after commencing this friendship, Antoniou and Debtor discussed forming a business to open and operate grocery stores in the Chicagoland area. In March of 2007, they agreed to proceed as equal partners, with a plan to acquire existing grocery stores owned by M.S. Grand, Inc. and to jointly own and operate the stores under the name of "Farmer's Fresh Market."

Thereafter, in July of 2007, Debtor and Antoniou agreed to form a corporation for each individual store. They would own equal beneficial ownership interests in each such corporation, and they or their nominees would be the sole officers and directors thereof.

On July 11, 2007, the first of these corporations, Plaintiff Hellenic Enterprise I, Inc. ("Hellenic") was formed as an Illinois corporation, with Debtor and Antoniou as its sole officers, directors, and shareholders.[1]

Prior thereto, on June 28, 2007, Antoniou, as promoter and acting on behalf of the not-yet-incorporated Hellenic, entered into written agreements (the "Memoranda of Understanding") with M.S. Grand, whereby Hellenic was to acquire from M.S. Grand the leases of two stores located in Bridgeview and Melrose Park, Illinois. The parties agreed on the terms and provisions of the proposed leases. Copies of the Memoranda of Understanding are attached to the Complaint as Exhibits A and B. Exhibit A appears to be the Memorandum of Understanding with respect to the Bridgeview store, and it is directed to the "[a]ttn" of Bob (i.e., Debtor) and Gus (presumably, Antoniou). The Memorandum of Understanding is signed by "Seung Lee Investment Director M.S. Grand." The other signature line is listed as "Hellenic Enterprises I Inc.," above which appears

---

[1]     Plaintiffs allege elsewhere in the Complaint that Debtor is a "former" officer, director and shareholder of Hellenic.

-2-

someone's signature. The Memorandum of Understanding provides certain "agreed upon terms for the lease," including, *inter alia*, that "[t]he lessee is responsible for all of the necessary required build outs." The last paragraph of the Memorandum states that Hellenic was informed that it could start construction on the property immediately while the lease documents were being prepared.

The Memorandum of Understanding attached as Exhibit B to the Complaint, though similar, contains certain changes in the proposed lease terms. In addition, it lists at the top not only the Bridgeview store address but also the address of the Melrose Park store; however, the provisions appear to relate only to the Bridgeview store. This Memorandum is unsigned.

On June 28, 2007, i.e., the same date as is shown on the Memoranda of Understanding, a letter was executed and delivered to Hellenic, signed by "Seung Lee" as "Investment Director." Plaintiffs characterize the letter as a "Letter Agreement" executed by M.S. Grand (the "Letter Agreement"). The Letter Agreement directs Hellenic to "[p]lease proceed with construction on both locations listed above [i.e., both Bridgeview and Melrose Park] while the preparation of the Leases is in process." The Letter Agreement further provides, *inter alia*, that "[u]nless both parties agree not to proceed with the Lease until the Lease is prepared and signed, Hellenic Enterprises, Inc. has the first right to Lease on both properties." A copy of the Letter Agreement is attached to the Complaint as Exhibit C.

Hellenic agreed to the terms of the Letter Agreement and the Memoranda of Understanding and caused its then attorney to prepare and submit leases and other documents to M.S. Grand for approval and signature. Attached as Exhibit D to Plaintiffs' Complaint is a copy of the proposed "Commercial Lease Agreement" for the Bridgeview premises, between M.S. Grand, Inc., as lessor, and Hellenic, d/b/a Farmers Fresh Market, Inc., as lessee.

Sometime in late June or July of 2007, Debtor and Antoniou were put on notice of an objection to their planned use of the name "Farmers Fresh Market." As a result, they decided to use the name "Melrose Fresh Market" for their stores.

In July of 2007, construction work began at the Bridgeview and Melrose Park stores. Antoniou was "intimately involved" with much of the work being done there, including the installing of security measures, performing carpentry services, installing refrigeration equipment, installing fixtures, purchasing equipment and materials, relocating and conducting inventory, providing dumpsters, employing architects, and meeting with both the Bridgeview and Melrose Park building inspectors. Antoniou was billed for much of these services and equipment.

In connection with the effort to open the stores, Antoniou performed the following services: 1) he filed an application for building and zoning permit with the City of Bridgeview, listing his affiliate, GD3Pantheon, as general contractor and plumbing contractor (an unsigned copy of which is attached as Exhibit E to the Complaint); 2) he retained nDeviX Corp. to provide a proposal (attached as Exhibit F) for security cameras and other security measures and to install such measures; 3) he retained a mechanical contractor, Testone Mechanical, Inc. (whose invoices are attached as Exhibit G), to perform refrigerator/freezer services at the Melrose Park store; and 4) he retained an architectural company, Gleason Architects, P.C., to prepare floor plans of the two stores and to perform other architectural services. (Gleason's invoice for services relating to the Bridgeview store is attached to the Complaint as Exhibit H, and Gleason's floor plan of the Melrose Park store is attached as Exhibit I.)

In early August of 2007, Antoniou made repeated efforts to contact M.S. Grand concerning the status of the leases that had been submitted for its review. M.S. Grand did not respond.

-4-

Attached to the Complaint as Exhibit J is an email from Antoniou to Seung Lee of M.S. Grand making one such inquiry.

Beginning in early August of 2007, Debtor began a course of action intending to "freeze" Antoniou and Hellenic out of the business. For example, Debtor denied Antoniou and his agents access to both stores and threatened to have Antoniou arrested if he ever attempted to enter either of the stores.

On August 13, 2007, unbeknownst to Plaintiffs, Debtor acquired all of the common stock in M.S. Grand Bridgeview, Inc. ("MSGB"), a company that M.S. Grand had created to hold the lease to the Bridgeview store. As part of this acquisition, and in accordance with the provisions of the stock sale agreement, Debtor acquired the lease of the Bridgeview store, which was amended on that date to reflect the terms that had previously been negotiated by Hellenic. A copy of the rider to that "certain lease dated February 28, 2007, by and between M.S. Grand Holdings Illinois, LLC, Lessor, and MS Grand Bridgeview, Inc. an Illinois corporation D/B/A Melrose Fresh Market, Lessee" - - which effected the amendment - - is attached to the Complaint as Exhibit L. Attached as Exhibit K is the "Agreement to Sell Common Stock" between M.S. Grand Bridgeview, Inc., as seller, and Debtor, as purchaser. The stock sale agreement provided a purchase price for the shares of $10.00. It further provided that the obligations of the parties thereto were conditioned, *inter alia*, on Debtor procuring a release, on or prior to the closing date, of MSGB's obligations under the Bridgeview lease.

A bill of sale was also executed on August 13, 2007, memorializing the transfer to Debtor of "[e]xisting items actually present on the premises including all grocery store shelving, equipment currently on the premises; twelve (12) cash registers; and complete former cub food store; and all

-5-

exterior signs." A copy of the bill of sale is attached to the Complaint as Exhibit M.

Two days after these transactions were entered into, and again unbeknownst to Plaintiffs, Debtor transferred his interest in MSGB to his brother-in-law, Constantine Falakos, for $5,000 plus a "future amount" of $50,000 if Falakos purchased the Bridgeview store property by August 1, 2010. A copy of the stock sale agreement between Debtor and Falakos is attached to the Complaint as Exhibit N. Debtor also executed and delivered to Falakos a bill of sale, similar to the one received by Debtor from MSGB, a copy of which is attached as Exhibit O. Notwithstanding the transfers to Falakos, Debtor continues to collect a salary of $400 per week from MSGB for consulting services. A copy of a "payment record" documenting certain of such payments is attached to the Complaint as Exhibit P.

In order to fund the remainder of the construction and renovation work at the Bridgeview store, Constantine Falakos and his brother Nick Falakos jointly provided the sum of $400,000. An additional $400,000 was provided by one Mike Limperis. In exchange for these contributions, Constantine Falakos caused one third of the MSGB stock to be distributed to himself and his brother and one third to Mike Limperis. The remaining third was distributed to Debtor's son, Efstravius Vitogiannis, who became a store manager. Efstravius paid no consideration for his shares and has little or no experience managing a grocery store the size of the Bridgeview store.

On August 28, 2007, after finally becoming aware of some of Debtor's actions, Plaintiffs caused their counsel to send a letter to Debtor, a copy of which is attached to the Complaint as Exhbit Q, warning that he was in breach of his fiduciary duty to Plaintiffs and that he should cease and desist from any further actions to freeze Antoniou out of the business and to deny him access to the stores. Debtor never responded to the letter.

Accordingly, on September 7, 2007, Plaintiffs filed a complaint in the Circuit Court of Cook County, Illinois,[2] alleging that Debtor had breached his fiduciary duties to Hellenic and Antoniou by diverting and usurping certain of Plaintiffs' rights and assets for his own benefit. Plaintiffs served the state court complaint and summons, by special process server, upon Debtor. A copy of the affidavit of service is attached to the Complaint as Exhibit R. The state court complaint was later amended to contain five counts against Debtor, including, *inter alia*, breach of fiduciary duty, tortious interference with a business relationship, and civil conspiracy.

Despite the filing of the state court suit, Debtor and certain of the other defendants named therein proceeded with their plan to open the stores without Plaintiffs' participation and without disclosure to Plaintiffs. The Bridgeview store was opened for business in late November or early December of 2007. It is currently owned and/or operated by Melrose Fresh Market, Inc., a company that Debtor caused to be incorporated on September 14, 2007. Attached as Exhibit S to the Complaint is a copy of the articles of incorporation. Melrose Fresh Market, Inc. is or was owned or controlled, in whole or in part, by Debtor and Mike Limperis, Constantine Falakos, Nick Falakos, and Steve Vitogiannis, all of whom are Debtor's friends or family members.

In addition to the foregoing allegations of the Second Amended Adversary Complaint, Plaintiffs allege that Debtor continues to retain possession and control over the assets of Hellenic, including but not limited to security equipment, refrigeration equipment, grocery store fixtures and inventory, and "various other pieces of equipment and materials." Plaintiffs also allege that Debtor fraudulently obtained the leases to the Bridgeview and Melrose Park stores, "a corporate opportunity

---

[2]    Elsewhere in the Complaint, Plaintiffs allege that the filing was made on September 6, 2007.

and property interest belonging to Hellenic and Antoniou, as a shareholder of Hellenic." Plaintiffs

assert in Count I that Debtor incurred a debt to Plaintiffs which is nondischargeable under

§523(a)(2)(A) of the Bankruptcy Code "because [he] obtained the property interests belonging to

Hellenic and Antoniou by engaging in fraud ..." and thereby incurred a debt to both Hellenic and

Antoniou. Count II contains similar allegations and asserts that Debtor committed the alleged fraud

in breach of his fiduciary duty as an officer and director of Hellenic. Accordingly, Count II seeks

a determination that the debt owed to Plaintiffs is also nondischargeable pursuant to § 523(a)(4) of

the Bankruptcy Code.

Debtor has moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6), applicable

herein by virtue of Bankruptcy Rule 7012(b).


**Discussion.**

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain, *inter alia*, "a short

and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

As noted by the Seventh Circuit in *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773 (7th

Cir. 2007), the Supreme Court "has interpreted that language to impose two easy-to-clear hurdles.

First, the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of

what the ... claim is and the grounds upon which it rests.' ... Second, its allegations must plausibly

suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if

they do not, the plaintiff pleads itself out of court." *Id.* at 776 (citing *Bell Atlantic Corp. v. Twombly*,

127 S.Ct. 1955, 1964 (2007)). While the complaint need not contain detailed factual allegations, "a

plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65. The plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007)(citing *Bell Atlantic*).

Where fraud is alleged, a more rigorous pleading standard comes into play. Rule 9(b) provides, *inter alia*, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under this standard, a plaintiff must state the "who, what, when, and where of the alleged fraud." *Uni Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992). The particularity requirement of Rule 9(b) applies equally to all claims which are based upon an underlying fraud, including fraud claims under §523(a)(2)(A), *see In re Lane*, 937 F.2d 694, 698 (1st Cir.1991), and complaints under §523(a)(4) concerning fraud in a fiduciary capacity. *See In re Volpert*, 175 B.R. 247, 260 (Bankr.N.D.Ill.1994).

### Count I:  Plaintiffs' Claim under §523(a)(2)(A) of the Bankruptcy Code.

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Debtor has asserted in his motion to dismiss that Plaintiffs' allegations are insufficient to state a claim under this provision because "[t]he Amended Complaint does not allege a single misrepresentation" by Debtor to Plaintiffs. Motion to Dismiss, at 6. Plaintiffs, in their response, note that allegation of a misrepresentation is not necessarily required to state a claim under §

-9-

523(a)(2)(A), citing, *inter alia*, the Seventh Circuit's decision in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), discussed below. In reply, Debtor contends that the Complaint nonetheless fails to allege any fraudulent activity - - non-misrepresentational or otherwise. Debtor goes through the litany of allegations set forth in the Complaint, noting in each instance that the activity alleged is not fraudulent. For example, Debtor notes that ¶ 21 of the Complaint alleges that Debtor acquired the stock in MSGB, and Debtor states: "There is nothing fraudulent about an individual purchasing stock." Reply, at 2. He further notes, *inter alia*, that in ¶ 22, Plaintiffs allege that Debtor "took over" a lease. Debtor states: "There is nothing fraudulent about two companies entering into a lease agreement ..." *Id*. at 3. After going through the remaining allegations of the Complaint in a similar manner, Debtor again states that there is nothing fraudulent about any of these activities "on their face." *Id*. at 4.

Debtor goes on to assert that "[t]he only way that these actions might be fraudulent is if they were done 'while [the Defendant] was acting in a fiduciary capacity,'" *id*., and since there is another provision of the Code, i.e., § 523(a)(4), that deals with such frauds, they cannot also come within the purview of § 523(a)(2)(A). In support of this assertion, Debtor cites the Seventh Circuit's decision in *In re Gulevsky*, 362 F.3d 961 (7th Cir. 2004), where the creditor sought a nondischargeability determination under § 523(a)(6) based on the Debtor's false oral financial statement. In affirming the district court's decision that oral statements of financial condition were not actionable under § 523(a)(6), the Court first noted that debts procured by false *written* financial statements are specifically addressed and made nondischargeable in § 523(a)(2)(B). The Court then joined the "few other courts" that had been confronted with the issue, which were unanimous in holding that "§ 523(a)(6) cannot be used to circumvent § 523(a)(2)(B)'s writing requirement." *Id*. The Court agreed

with those decisions "in no small part because of the Pandora's box that would be opened in the absence of § 523(a)(2)(B)'s writing requirement." *Id.*

Debtor contends that *Gulevsky* applies here to preclude Plaintiffs from proceeding under § 523(a)(2)(A). It is Debtor's position, as discussed further below, that Plaintiffs cannot meet § 523(a)(4)'s requirement of a "fiduciary" relationship. Accordingly, Debtor urges that allowing Plaintiffs to proceed instead under § 523(a)(2)(A) would render the "fiduciary" requirement of § 523(a)(4) superfluous.

Debtor's reliance on *Gulevsky* is misplaced. While the *Gulevsky* panel noted that according to ordinary rules of statutory construction, a specific provision controls over a general, and "the subsections of § 523 should not be construed to make others superfluous," *Gulevsky*, 362 F.3d at 963, the interpretation of § 523(a)(6) advocated by the creditor in *Gulevsky* would have entirely negated the writing requirement of § 523(a)(2)(B), an important evidentiary protection for debtors. As noted in *In re Alicea*, 230 B.R. 492, 508 (Bankr. S.D.N.Y. 1999), the provisions of § 523(a)(2)(B), including the writing requirement, were "intended to protect debtors by restricting certain kinds of dischargeability claims based on fraud." Again, it was largely because of the "Pandora's box" that would be opened by negation of § 523(a)(2)(B)'s writing requirement that led the Seventh Circuit in *Gulevsky* to hold that oral statements of financial condition were not actionable under § 523(a)(6).

Here, however, application of § 523(a)(2)(A) to the facts alleged in the Complaint would not negate or render superfluous the fiduciary requirement of § 523(a)(4). Indeed, Debtor does not explain why § 523(a)(4) should be the governing provision or how application of § 523(a)(2)(A) to the facts alleged here would render 523(a)(4)'s fiduciary requirement superfluous. Again, Debtor

-11-

simply states that the actions described in the Complaint can only "be fraudulent ... if they were done 'while [the Defendant] was acting in a fiduciary capacity' ..." Reply, at 4. He summarizes the allegations of the Complaint as describing a usurpation by Debtor of a business opportunity that he and Antoniou had agreed to pursue as equal partners and states that § 523(a)(4) specifically deals with this type of fraud. *Id.* Debtor appears to be focusing on a cause of action for usurpation of a corporate opportunity - - one of the theories advanced by Plaintiffs - - which ordinarily requires proof of wrongdoing by a corporate officer or director, i.e., a state law fiduciary. Debtor contends, however, that no fiduciary relationship existed here. Nonetheless, he apparently contends that § 523(a)(4) - - as the provision more specifically addressing a usurpation claim - - should control, to the exclusion of § 523(a)(2)(A).

An argument similar to Debtor's was made in *In re Tallant*, 218 B.R. 58 (9th Cir. BAP 1998), a case involving an attorney/debtor who obtained an unsecured loan from his client, without advising him that the loan transaction created adverse pecuniary interests between them and without advising the client of his right to seek independent legal counsel, all as required by applicable rules of professional responsibility. After the debtor filed a chapter 7 petition, the client sought a determination of nondischargeability, *inter alia*, under § 523(a)(2)(A) and (a)(4).[3] The bankruptcy court denied the § 523(a)(4) claim, holding "that the attorney-client relationship and the disclosure rules applicable to an attorney-client loan did not create an express trust, which [was] required to state a claim under § 523(a)(4)." *Id.* at 63 (citing to bankruptcy court opinion). The bankruptcy court nonetheless held the debtor's nondisclosures to be actionable under § 523(a)(2)(A).

---

[3]     The complaint actually alleged only §§ 523(a)(2)(B) and (a)(4) claims; however, the parties argued the § 523(a)(2)(A) claim at trial. *Tallant*, 218 B.R. at 63.

-12-

On appeal, the debtor argued that "because § 523(a)(4) specifically deals with fiduciary relationships ..., it would be inappropriate to hold that the ethical violations of an attorney also fall within § 523(a)(2)(A)." *Id.* at 64. In affirming the lower courts' holding that the attorney's nondisclosures were actionable under § 523(a)(2)(A), the appellate panel observed that "the subsections of § 523 are generally not mutually exclusive."[4] The panel cited, *inter alia*, the Tenth Circuit's opinion in *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367 (10th Cir. 1996), which expressly recognized that a debt owed by an attorney to his former client, involving similar nondisclosures, could be nondischargeable in the attorney's bankruptcy under § 523(a)(2)(A), notwithstanding the absence of a § 523(a)(4) fiduciary relationship. *Tallant*, 218 B.R. at 64 (citing *Young*). The *Tallant* panel concluded that "[b]ecause §§ 523(a)(2)(A) and (a)(4) are not mutually exclusive," it was not error for the bankruptcy court to consider and apply § 523(a)(2)(A) to the facts before it. *Tallant*, 218 B.R. at 64. *See also In re Britt*, 156 B.R. 511 (Bankr. E.D.Va. 1993) (debt found nondischargeable under both §§ 523(a)(2)(A) and (a)(4)); *In re Maurice*, 138 B.R. 890 (Bankr. N.D.Ill. 1992), *aff'd.*, 21 F.3d 767 (7th Cir. 1994) (debt found nondischargeable under both §§ 523(a)(2)(A) and (a)(6)).

This court agrees that §§ 523(a)(2)(A) and (a)(4) are not mutually exclusive, and whether or not a fiduciary relationship existed here between Debtor and one or more of the Plaintiffs, the allegations of the Complaint may also support a fraud claim under § 523(a)(2)(A), provided that all the elements of such a claim are met.

As indicated above, § 523(a)(2)(A) excepts from discharge debts for money, property, or

---

[4]     The Court noted, however, that §§523(a)(2)(A) and (a)(2)(B) *are* mutually exclusive, the former governing frauds that do not involve a statement concerning the debtor's financial condition, and the latter governing frauds which do involve such statements. *See also* H.R.Rep. 95-595, at 549 (1977).

services (or extensions or refinancings of credit) to the extent obtained by 1) false pretenses, 2) a

false representation, or 3) actual fraud.[5] While it was often held that a single test applies to these

three separate grounds for nondischargeability, the Seventh Circuit made it clear in *McClellan v.

Cantrell*, 217 F.3d 890 (7th Cir. 2000), that misrepresentation and reliance thereon are not always

required to establish "actual fraud." *In re Jairath*, 259 B.R. 308, 314 (Bankr. N.D.Ill. 2001) (citing

*McClellan*, 217 F.3d at 894). In *McClellan*, the Seventh Circuit stated:

> No learned inquiry into the history of fraud is necessary to establish that it is
> not limited to misrepresentations and misleading omissions. "Fraud is a generic
> term, which embraces all the multifarious means which human ingenuity can
> devise and which are resorted to by one individual to gain an advantage over
> another by false suggestions or by the suppression of truth. No definite and
> invariable rule can be laid down as a general proposition defining fraud, and it
> includes all surprise, trick, cunning, dissembling, and any unfair way by which
> another is cheated."

*Cantrell*, 217 F.3d at 893 (quoting from *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54

(1952).

Courts have noted that where non-representational fraud is alleged, a different analysis must

be employed to assess the sufficiency of the plaintiff's allegations. *See In re Burke*, 398 B.R. 608,

624 (Bankr. N.D.Ill. 2008); *In re Howard*, 339 B.R. 913, 918 (Bankr. N.D.Ill. 2006); *In re Jairath*,

259 B.R. 308, 314 (Bankr. N.D.Ill. 2001). The creditor must show that 1) a fraud occurred; 2) the

debtor acted with intent to defraud; and 3) the fraud created the debt at issue. *See Burke*, 398 B.R.

at 625; *Jairath*, 259 B.R. at 314; *see also In re Demopoulos*, 2008 WL 4489153, *8 (Bankr. N.D.Ill.

Sept. 23, 2008).

Here, the Complaint contains allegations that, if proved, would adequately establish the first

---

[5] False representations concerning the financial condition of the debtor or an insider, however, are
excluded; they are governed by §523(a)(2)(B).

two elements described in the case law, i.e., that a fraud occurred and that Debtor acted with the

requisite intent. Again, fraud can be "'any deceit, artifice, trick, or design involving direct and active

operation of the mind, used to circumvent and cheat another.'" *McClellan*, 217 F.3d at 893 (quoting

4 *Collier on Bankruptcy* ¶ 523.08[1][e] (15th ed. 2000).  Plaintiffs allege that Debtor pursued a

course of conduct that was designed to "freeze" Plaintiffs out of the business that Debtor and

Antoniou had agreed to jointly pursue, and the Complaint contains allegations as to how this plan

was accomplished, including, *inter alia*, Debtor's secret acquisition of the stock in MSGB, the lessee

of the Bridgeview store.  The Complaint alleges the "who, what, when, and where" of the alleged

fraud and contains sufficient detail in this regard to give Debtor fair notice of what the fraud claim

is and the grounds upon which it rests.  While Debtor urges that "[t]here is nothing fraudulent about

an individual purchasing stock" or about any of the other acts alleged in the Complaint, Reply at 2-4,

it is not the individual acts, taken separately, that constitute the alleged fraud, it is the course of

action comprised of those acts and the secret, culpable purpose with which the scheme was pursued.

   The third element discussed in the case law is whether the fraud created the debt at issue.

*Burke*, 398 B.R. at 625; *Jairath*, 259 B.R. at 314.  More specifically, the statute requires that the debt

be for "money, property, or services ... obtained" by actual fraud.[6]  As noted by the Seventh Circuit

in *McClellan*, the statute speaks not of "debt[s] ... created by fraud," but of "'... debt[s] ... for money,

property, [or] services ... to the extent obtained by ... actual fraud.'" *McClellan*, 217 F.3d at 895

(quoting § 523(a)(2)(A)).  The Court observed that the "words 'obtained by' go with 'money,

property, [or] services,' not with 'debt.'" *Id.*

   Accordingly, while neither party has addressed this specific issue, the court must consider

---

[6]    As indicated above, the statute also covers debts for extensions, renewals, or refinancings of credit.

-15-

whether the allegations of the Complaint are sufficient to plausibly suggest that Debtor obtained

money, property, or services through the alleged fraud.  This issue has arisen in the case law not only

in the context of § 523(a)(2)(A), but also in connection with nondischargeability claims under §

523(a)(4) for embezzlement and for injury to property under § 523(a)(6).  In *Digital Commerce, Ltd.*

*v. Sullivan (In re Sullivan)*, 305 B.R. 809 (Bankr. W.D.Mich. 2004), the debtor was president of

Digital Commerce, a company that designed for its clients software to sell products over the internet.

The debtor solicited a client on behalf of Digital Commerce but later diverted the opportunity to a

new company that he and another employee had set up to engage in the same type of business.

Ultimately, the debtor's new company procured the business and profited therefrom.  *Id*. at 814-18.

In the debtor's subsequent bankruptcy, Digital Commerce filed a complaint seeking a

nondischargeability determination under each of §§ 523(a)(2)(A), (a)(4), and (a)(6).  After a trial,

the court found that the debtor had usurped a corporate opportunity in violation of his fiduciary duty

of good faith under Michigan law.  *Id*.  Although the court held that the debtor had not been acting

in a "fiduciary capacity" within the meaning of § 523(a)(4),[7] the court found that the diversion of the

corporate opportunity constituted "embezzlement" within the purview of the same provision.

Because embezzlement requires a fraudulent appropriation of property,[8] the court addressed the

"threshold question" whether "*intangible* property, such as a business opportunity, [can] be

embezzled for purposes of § 523(a)(4)."  *Id*. at 826.

The court looked for guidance on this issue to the law of conversion.  Although at early

---

[7]    In the Sixth Circuit, only express or technical trusts will give rise to "fiduciary capacity" within the meaning of §523(a)(4).  *See, e.g., In re Garver*, 116 F.3d 176, 179 (6th Cir. 1997).

[8]    "Embezzlement" has been defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *Matter of Weber*, 892 F.2d 534, 538 (7th Cir.1989) (quoting *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295 (1895)).

common law, only tangible chattels could be the subject of a conversion claim, the "action has 'undergone a slow process of extension.'" *Id.* (quoting *Restatement (Second) of Torts* § 242 cmt. d (1965)). This expansion process "'has stopped with the kind of intangible rights which are customarily merged in, or identified with some document.'" *Sullivan*, 305 B.R. at 826 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 15, at 92 (5th ed. 1994)). Noting, however, that the expansion process "'has not ... necessarily terminated,'" *Sullivan*, 305 B.R. at 826 (quoting *Restatement (Second) of Torts* § 242 cmt. f (1965)), the court concluded that in the embezzlement context under § 523(a)(4),

> there is no cogent reason to exclude intangible property from the coverage of the statute. A creditor ... can be cheated or deprived of intangible property just as easily as tangible personal property or money. In this modern society, with its great reliance upon intellectual property and commercial ideas, theft of intangible property is always possible.

*Sullivan*, 305 B.R. at 826. The court acknowledged that construing "property" to include intangibles in the embezzlement context "may be subject to some criticism," but believed that the facts of the case nonetheless warranted such a holding. *Id.*[9]

---

[9]     The *Sullivan* court also found the usurpation of the corporate opportunity to be actionable under §§523(a)(2)(A) and (a)(6), but did not discuss the "property" issue in either of those contexts.

In *National Sign and Signal v. Livingston (In re Livingston)*, 379 B.R. 711 (Bankr. W.D.Mich. 2007), the court considered the "property" issue under all three subsections. The debtor, who was vice president of a manufacturing firm, planned on starting his own company, and he held a secret meeting at which he solicited investments from certain of the firms that constituted his employer's primary sources of business. Two of the three solicited firms invested in the debtor's new company, and ultimately, the employer obtained a $1.8 million state court judgment against the debtor for breach of fiduciary duty and unlawful interference with business relationships. In the debtor's subsequent bankruptcy, the court declined to find an embezzlement within the purview of §523(a)(4), noting that "what [the employer] claims [the debtor] embezzled falls well outside even *Sullivan's* broad definition of property." *Id.* at 717. The $1.8 million judgment was not predicated on disruption of the employer's written agreements with the solicited firms, since those contracts were terminable at will on only 30 days' notice; the damages arose from disruption of the informal, noncontractual relationships with those firms that the employer had developed over many years of doing business. The court found that such informal business relationships could not be "embezzled" for purposes of §523(a)(4). *Id.* For similar reasons, the court found that no "property" had been "obtain[ed]" by the debtor for purposes of §523(a)(2)(A), and he had not injured "property" of the employer for purposes of §523(a)(6). *Id.* at 717-19.

The court in *Weidle Corp. v. Leist (In re Leist)*, 398 B.R. 595 (Bankr. S.D.Ohio 2008),

reached a contrary conclusion, applying Ohio law. There, the debtor was a real estate broker, who

had a long-standing business relationship with the plaintiff, a real estate developer. The plaintiff

asked the debtor to make an offer on a parcel of real estate at a specified price, and the debtor instead

submitted an offer on his own behalf. Ultimately, the debtor purchased the property, and the plaintiff

thereafter obtained a state court judgment against him for breach of his contractual and fiduciary

obligations in the amount of $461,325, representing lost profits.

In the debtor's subsequent bankruptcy, the plaintiff sought a summary judgment of

nondischargeability based upon embezzlement under § 523(a)(4) and willful and malicious injury

under § 523(a)(6). Characterizing the "key issue" under § 523(a)(4) as "whether the corporate

business opportunity is property susceptible to embezzlement," *id.* at 601, the court stated that the

issue under Ohio law was "a difficult one because the question has little meaning outside of the

bankruptcy context" and is rarely addressed in reported case law. *Id.* at 602-03. Looking for

guidance in analogous state and federal cases, the court noted that copyrights, trademarks, and other

intangible intellectual property have been found capable of being converted or embezzled. *Id.* at 602

(citations omitted). The court further noted, however, that the Ohio Supreme Court had

distinguished such interests from other intangible rights in determining what interests could be

subject to conversion:

> [I]n *Zacchini v. Scripps-Howard Broadcasting Co.*, the Supreme Court of Ohio
> broadened the scope of 'property' that could be the subject of a conversion claim
> when it stated that "it is now generally held that intangible rights which are
> customarily merged in or identified with some document may also be converted."
> ... 351 N.E.2d 454, 456-57 (1976), *reversed on other grounds*, 433 U.S. 562 ...
> (1977). The court noted that "[e]xamples include drafts, bank passbooks, and
> deeds." *Id.* at 457. However, the court also stated that "conversion does not

-18-

apply to any intangible right ... The distinguishing characteristic of conversion
is the forced judicial sale of the chattel or right of which the owner has been
wrongfully deprived. In the case of such intangible quasi-proprietary rights as
are involved here, a forced sale would be largely absurd, because of the doubt-
fulness of determining what has been 'taken.'" *Id.* The court distinguished
intangible copyrights interests from the interests involved in that case. *Id.*

*Leist*, 398 B.R. at 603. The *Leist* court concluded - - citing other Ohio cases limiting the scope of

property subject to conversion and the Sixth Circuit's admonition to construe the nondischargeability

sections narrowly - - that "the non-exclusive opportunity to buy a parcel of real property that is not

reduced to writing (in the form of an option contract or other enforceable written agreement) is more

akin to the intangible rights or interests which the Supreme Court of Ohio determined do not

constitute 'property.'" *Id.* at 604. The *Leist* court likewise found that the corporate opportunity was

not "property" for purposes of a "willful and malicious injury ... to ... property" under § 523(a)(6),

but nonetheless held the debt nondischargeable on the ground that the usurpation of the opportunity

constituted a "willful and malicious injury ... to [an] entity" under that same provision. *Id.* at 604-08.

Here, the court must consider whether a corporate opportunity rises to the level of a property

interest under Illinois law,[10] - - again, a difficult issue rarely addressed in the case law. Looking for

guidance first in the conversion context, the court notes that in *In re Thebus*, 108 Ill.2d 255, 483

N.E.2d 1258 (1985), the Illinois Supreme Court stated that

... "[t]he essence of an action for conversion is the wrongful deprivation
of property from the person entitled to possession." [quoting from *Farms
Associates, Inc. v. Sternback*, 77 Ill.App.3d 249, 252 (1979)] In 18 Am.Jur.2d
*Conversion*, sec. 9, at 164 (1965), it is stated: "It is ordinarily held, however,
that an action for conversion lies only for personal property which is tangible,

---

[10]     As noted by the court in *Leist*, other than certain federally created rights and interests, property
interests are generally created and defined by state law. "Thus, while the court looks to federal bankruptcy law to
determine whether an exception to discharge under § 523(a) has been met, the court must look to applicable
substantive federal and state law to determine the existence and nature of interests in property." *Leist*, 398 B.R. at
602.

-19-

or at least represented by or connected with something tangible."

*Thebus*, 483 N.E.2d at 1260. However, in *Conant v. Karris*, 165 Ill.App.3d 783 (1st Distr. 1987),

the appellate court held that a conversion claim could be maintained for the unauthorized disclosure

of confidential information contained in a computer printout. *Id.* at 792. And in *Stathis v.*

*Geldermann*, 295 Ill.App.3d 844, 692 N.E.2d 798 (1st Distr. 1998), the court, in dictum, stated that

"parties may recover for conversion of intangible assets" in Illinois.[11]

Our own federal district court has characterized this conversion issue under Illinois law as

unsettled and unresolved,[12] the question having arisen frequently in the "massive nationwide

litigation campaign that DirecTV is undertaking to protect its satellite cable television system against

piracy." *DirecTV, Inc. v. Patel*, 2003 WL 22682443 at *1 (N.D.Ill. Nov. 12, 2003). In *DirecTV, Inc.*

*v. Ostrowski*, 334 F.Supp.2d 1058 (N.D.Ill. 2004), the court noted that (as of the date of that

decision), five judges within this district had held that conversion could not be maintained for the

unauthorized interception and display of satellite programming,[13] and three had ruled that a cause

---

[11]    The court went on to state: "Assuming that conversion of intangible assets is legally cognizable,
the jury's finding that defendants did not convert [plaintiff's] property was not against the manifest weight of the
evidence, and its verdict ... must be upheld." *Id.* at 856.

[12]    *See, e.g., Concept Innovation v. CFM Corp.*, 2005 WL 670637 at *8 (N.D.Ill. Mar. 21, 2005);
*DirecTV, Inc. v. Sampey*, 2004 WL 2032102 at *5 (N.D.Ill. Aug. 19, 2004); *DirecTV, Inc. v. Ostrowski*, 334
F.Supp.2d 1058, 1063 (N.D.Ill. 2004); *DirecTV, Inc. v. Patel*, 2003 WL 22682443 at *2 (N.D.Ill. Nov. 12, 2003).

[13]    These decisions noted the unresolved issue under Illinois law regarding conversion as to intangible
property, but dismissed the conversion claim instead on the basis of an insufficient deprivation, i.e., the plaintiff
continued to benefit from its encrypted satellite signals during the entirety of the defendant's alleged wrongful
misappropriation. *See DirecTV v. Hinton*, 2004 WL 856555, at *4 (N.D.Ill. April 21, 2004) (Darrah, J.); *DirecTV v.*
*Frey*, 2004 WL 813539, at *4 (N.D.Ill. April 14, 2004) (Zagel, J.); *DirecTV v. Maraffino*, 2004 WL 170306, at *4
(N.D.Ill. Jan. 23, 2004) (Lefkow, J.); *DirecTV v. Castillo*, 2004 WL 783066, at *2 (N.D.Ill. Jan. 2, 2004) (St. Eve,
J.); *DirecTV v. Patel*, 2003 WL 22682443, at *3 (N.D.Ill. Nov. 12, 2003) (Coar, J.).

of action was stated.[14]   The *Ostrowski* court further noted that the Illinois Supreme Court's statements in *Thebus* did not by themselves "make clear whether intangible property ever can properly be the subject of conversion in Illinois or if so, in what circumstances." *Id.* at 1063. Citing, *inter alia*, to *Conant* and *Geldermann*, and noting that "there is no clear answer in the Illinois caselaw on this issue," the *Ostrowski* court "cast its vote" with the courts upholding a conversion claim with respect to the unauthorized interception of satellite signals. *Id.* at 1063-64.

The *Ostrowski* court relied in large part on the Seventh Circuit's discussion in *FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300 (7th Cir. 1990), where the panel upheld the sufficiency of a claim against a television station for conversion of copies of documents containing business information relating to a defense contractor's pricing policies, where the contractor no longer had the originals. In dictum, the panel noted that "even if the retention of mere copies of documents did not constitute conversion, we think that FMC would also have a valid claim for conversion on the grounds that ABC is essentially depriving FMC of the *use* of its own business information." *FMC Corp.*, 915 F.2d at 304 (emphasis in original).

The *Ostrowski* court noted that while the *FMC* panel was applying California conversion law, the panel had stated that the same result would be reached under the conversion laws of most states. *Ostrowski*, 334 F.Supp.2d at 1064. (citing *FMC Corp.*, 915 F.2d at 302 n. 2). The *Ostrowski* court continued:

Of particular consequence for present purposes, in *FMC Corp.*, the Seventh

---

[14]     *See DirecTV v. Dillon*, 2004 WL 906104, at *4 (N.D.Ill. April 27, 2004) (Aspen, J.) (*Thebus* requirement that property be "at least represented by or connected with something tangible" is broad enough to encompass satellite signals broadcast and captured by alleged violator); *DirecTV v. Dyrhaus*, 2004 WL 626822, at *2 (N.D.Ill. March 26, 2004) (Shadur, J.) (same); *DirecTV v. Delaney*, 2003 WL 24232530, at *4 (N.D.Ill. Nov. 20, 2003) (Kocoras, J.) (under *Thebus*, conversion requires deprivation of an "identifiable object of property," and encrypted satellite programming satisfies that requirement).

Circuit stated that "As Prosser and Keeton have noted ... '[t]here is perhaps no
very valid and essential reason why there might not be conversion' of intangible
property." ... Further, the Seventh Circuit cited *Conant* as an example of "what
appears to be the modern trend of state law in protecting against the misuse of
confidential business information through conversion actions." ...

*Ostrowski*, 334 F.Supp.2d at 1064-65. Accordingly, under these "general teachings" from *FMC
Corp.*, the *Ostrowski* court held that the plaintiff had stated a claim for conversion of its satellite
programming. *Ostrowski*, 334 F.Supp.2d at 1065.

Notwithstanding, however, the 'modern trend' evidenced by the Illinois appellate decisions,
"the Illinois Supreme Court has not," as noted in *Patel*, "abrogated the clear principle that only
tangible property is the proper object of conversion suits." *Patel*, 2003 WL 22682443 at *2 n.1
(citing *Thebus*).[15] Indeed, a more recent Seventh Circuit pronouncement, in the context of the
alleged conversion of checks representing insurance premium payments, flatly states that "Illinois
courts do not recognize an action for conversion of intangible rights." *American National Insurance
Co. v. Citibank, N.A.*, 543 F.3d 907, 910 (7th Cir. 2008) (citing *Janes v. First Federal Savings &
Loan Ass'n.*, 11 Ill.App.3d 631, 297 N.E.2d 255, 260 (1973)). The court explained that the "rights
involved with commercial paper merge into the document, a tangible thing, and thus conversion of
the document is possible." *Id.* at 910 (citations omitted). However, the rights associated in that case
with the claimant's "separate contract" with the payee of the checks were "intangible and [did] not
merge into the negotiable instruments," thereby defeating its conversion claim. *Id.*

While there is no requirement in § 523(a)(2)(A) that the property obtained by the debtor be
tangible, the Illinois conversion decisions - - generally limiting conversion actions to tangible

---

[15] Some courts, however, have suggested that the principle announced in *Thebus* was more nuanced.
*See Ostrowski*, 334 F.Supp.2d at 1063; *DirecTV v. Delaney*, 2003 WL 24232530, at *3-4 (N.D.Ill. Nov. 20, 2003).

-22-

property - - nonetheless offer some guidance as to whether Illinois courts would consider an interest in a corporate opportunity to rise to the level of "property." Moreover, at least one Illinois appellate court has specifically recognized that while "the corporate opportunity doctrine prohibits a corporation's fiduciary from taking advantage of business opportunities which are considered as 'belonging' to the corporation (at least as far as the fiduciary is concerned)," corporations nonetheless "usually do not have a property interest in mere business opportunities ..." *Graham v. Mimms*, 111 Ill.App.3d 751, 762-63, 444 N.E.2d 549 (1st Dist. 1982). Indeed, as noted by one commentator, "the function of the corporate opportunity doctrine is to apply property-like protection where no conventional property right exists." Davis, "Corporate Opportunity and Comparative Advantage," 84 Iowa L.Rev. 211, 236 (1999). Accordingly, if the corporate opportunity were the only interest alleged to have been obtained by Debtor, the § 523(a)(2)(A) claim might be subject to dismissal.

The allegation of Hellenic's first right to lease the Bridgeview and Melrose Park stores adds little, if anything, to Plaintiffs' contention in this regard. The Seventh Circuit, in a case involving the federal government's attempt to foreclose a tax lien on a house occupied by the taxpayers as tenants with an option to purchase, stated that "[t]he grant of an option is enforceable in Illinois, but as a contract right, not a property right." *U.S. v. Swan*, 467 F.3d 655, 657 (7th Cir. 2006) (citations omitted).[16] An option contract has been defined in Illinois as "one by which the owner of property agrees with another person that the latter shall have the right to buy the former's property at a fixed

---

[16]    The Court further rejected the government's contention that a contract right can be recharacterized as a property right (and therefore subject to lien for a federal tax), stating that it could find no support in Illinois law for that proposition (and that even if it were true, it would only give the government the right to foreclose on the option, not the house). *Id.*

price within a certain time," though he has no obligation to do so. *Whitelaw v. Brady*, 3 Ill.2d 583, 121 N.E.2d 785, 789 (1954). As noted by the Seventh Circuit in a case applying Wisconsin law, a right of first refusal "is the weakest of options; technically it is not an option at all, because it does not require the grantor to offer the property subject to it for sale, ever." *Miller v. LeSea Broadcasting, Inc.*, 87 F.3d 224, 226 (7ᵗʰ Cir. 1996). Accordingly, if an option does not rise to the level of a property right in Illinois, *Swan*, 467 F.3d at 657, neither should a right of first refusal. *See Randolph v. Reisig*, 272 Mich.App. 331, 727 N.W.2d 388, 392 (2006) (concluding under Michigan law that since option contract does not create interest in land, neither does right of first refusal, which gives promisee even fewer rights).[17]

Plaintiffs, however, in addition to their other allegations, also allege that Debtor continues to retain possession and control over the assets of Hellenic, including but not limited to security equipment, refrigeration equipment, grocery store fixtures and inventory, and "various other pieces of equipment and materials." Plaintiffs thus allege that Debtor obtained "property" from Hellenic within the meaning of § 523(a)(2)(A). They further allege that in connection with the effort to open the stores, Antoniou performed a variety of services, including, *inter alia*, the filing of an application for building and zoning permit with the City of Bridgeview and the retention of mechanical and other contractors needed to ready the premises for operation. Plaintiffs thus allege that Debtor obtained "services" from Antoniou within the purview of § 523(a)(2)(A). While these "services" and "property" may ultimately prove to have been relatively insubstantial, that is an issue relating to damages and not to the adequacy of the Plaintiffs' allegations to state a plausible claim under §

---

[17]     The court further notes that in *In re Riso*, 978 F.2d 1151 (9ᵗʰ Cir. 1992), the Ninth Circuit held that the limited right of first refusal involved in that case was not "property" within the purview of the §523(a)(6) exception to discharge for willful and malicious injuries, *inter alia*, to property.

523(a)(2)(A). For all of these reasons, the court declines to dismiss Count I.

**Count II: Plaintiffs' Claim under §523(a)(4) of the Bankruptcy Code.**

Section 523(a)(4) excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." Here, Plaintiffs allege that Debtor, "as an officer and director of Hellenic owed a fiduciary duty to Hellenic and to Antoniou, as a shareholder," and that by secretly obtaining the leases to the Bridgeview and Melrose Park stores and committing the other acts constituting the alleged fraud discussed above, Debtor breached his fiduciary duty to Plaintiffs and incurred a debt nondischargeable under § 523(a)(4) as a debt for fraud while acting in a fiduciary capacity. Complaint, ¶'s 42-44.

For the reasons already explained, Plaintiffs have sufficiently alleged "fraud" for purposes of § 523(a)(4). *See McClellan*, 217 F.3d at 893-94 (indicating that "fraud" under § 523(a)(4) is likewise not limited to misrepresentations). As for the allegation of "fiduciary capacity," the court notes that the "existence of a 'fiduciary relationship' is a matter of federal law," and "not all relationships qualify under the Bankruptcy Code." *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000); *see also In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996) (although joint venturers may owe one another a fiduciary duty under Illinois law, that "does not end the case ..., because only a subset of fiduciary obligations is encompassed by the word 'fiduciary' in section 523(a)(4)").

In order to come within the purview of the "fiduciary capacity" of § 523(a)(4), the fiduciary relation must exist independent of the Debtor's wrong. *See In re Marchiando*, 13 F.3d 1111, 1115 (7th Cir. 1994) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151 (1934)). The Seventh Circuit in *Marchiando*, "prob[ing] more deeply the distinction between the fiduciary relation

-25-

that imposes real duties in advance of the breach and the fiduciary relation that does not," found that
"the first group of cases involve a difference in knowledge or power between fiduciary and principal
which ... gives the former a position of ascendancy over the latter." *Id.* at 1116 (citations omitted).
The Court explained:

> The fiduciary may know much more by reason of professional status, or the
> relation may be one that requires the principal to repose a special confidence
> in the fiduciary; both factors are present in the case of a lawyer-client relation
> and also the relation between director and shareholder or managing partner
> and limited partner. Or the principal may be a child, lacking not only knowl-
> edge but also the power to act upon it. These are all situations in which one
> party to the relation is incapable of monitoring the other's performance of his
> undertaking, and therefore the law does not treat the relation as a relation at
> arm's length between equals.

*Id. Marchiando* involved a convenience store owner who had been licensed to sell lottery tickets
under the Illinois Lottery Law, which provided that the proceeds of such sales were to be segregated
as a trust fund until paid to the state. *Id.* at 1113. Referring to the alleged 'fiduciary' as a "ticket
agent with no edge based on the possession of power or expertise," the court found that "[t]he
inequality of relation that calls for the imposition of fiduciary duties [was] wholly absent." *Id.* at
1116.[18]   The convenience-store keeper who commingled the ticket sale proceeds was "at a
considerable remove from the lawyer who converts money in his clients' escrow accounts or the
bank trust department that invests someone's retirement fund recklessly." *Id.* at 1116-17.

The Debtor here, relying on the Seventh Circuit's statements concerning the importance of
a fiduciary's ascendancy in power or knowledge, contends that the Complaint fails to allege any such
inequality as between Plaintiffs and Debtor. Debtor points to Plaintiffs' allegation that Debtor and

---

[18]     The court notes that in *In re McGee*, 353 F.3d 537 (7th Cir. 2003), the Court stated that disparity in
knowledge or economic status was "not a *sine qua non.*" *Id.* at 541.

Antoniou agreed to proceed as equal partners, and he cites *Frain* for the proposition "that 'a joint venture between equals will not qualify as a fiduciary relationship.'"  Reply, at 5 (quoting from *Frain*, 230 F.3d at 1017 (citing, in turn, to *Woldman*, 92 F.3d at 547)).  As for Debtor's alleged status as an officer and director of Hellenic,[19] Debtor acknowledges that *Frain* referred to the director-shareholder relation as one example of a situation calling for the principal to repose special confidence in the fiduciary.  *Frain*, 230 F.3d at 1017.  Debtor nonetheless contends that this example "refer[s] to a situation where one party is a director and the other is *solely* a shareholder."  Reply, at 6 (emphasis added).

However, the plaintiffs in *Frain* were not only shareholders, but also directors.  In *Frain*, the Seventh Circuit reversed a judgment of the district court, which had found that the chief operating officer and 50% shareholder of a corporation was not a fiduciary of the corporation's other two shareholders, each of whom was a director and 25% stockholder.  The district court had rejected the minority shareholders' argument that the debtor's status of office alone satisfied *Marchiando*'s requirement of ascendancy and held, *inter alia*, that the fiduciary inquiry turned on the particular facts of each case.  *In re Frain*, 1999 WL 1269352, at *4 (N.D.Ill. Dec. 22, 1999), *rev'd, In re Frain*, 230 F.3d 1014 (7th Cir. 2000).  The district court examined the relationship between the plaintiff minority shareholders and the debtor/defendant chief operating officer, including detailed provisions in their shareholders' agreement, and concluded that there was not such a difference in knowledge or power as to give the debtor a position of ascendancy.  *Id.*

---

[19]    Debtor contends in a footnote to his motion to dismiss that no stock was ever issued to any shareholders of Hellenic, and no officers or directors were ever elected.  Debtor attaches in support an affidavit of Peter Limperis which was filed in the state court action.  The court has excluded these materials from consideration. *See* Fed.R.Civ.P. 12(d), applicable herein by virtue of Fed.R.Bankr.P. 12(b).

While the district court's decision was reversed, it is noteworthy that the Seventh Circuit did

not rely on the debtor's status of office alone to establish the fiduciary relation required by §

523(a)(4). To the contrary, the panel relied largely on the provisions of the parties' shareholder

agreement. The panel noted that under the shareholder agreement, the debtor was authorized to

make the day-to-day business decisions for the corporation, "giving him a natural advantage over

the other two shareholders in terms of knowledge of the corporation's finances." *Frain*, 230 F.3d

at 1017. However, even the debtor's "superior knowledge of day-to-day operations was not

sufficient in itself to establish a position of ascendancy," since such knowledge was not necessarily

unavailable to the other shareholders. *Id*. Other provisions of the shareholder agreement nonetheless

made clear that "the concentration of power was substantially one-sided." *Id*. The agreement was

structured to give the debtor ultimate power not only over his own employment but also over the

direction of the corporation. And since "major decisions" required the consent of 75% of the voting

shares (with some requiring unanimity), no major decisions could be made without the debtor's

agreement. *Id*. at 1018. Thus, while the district court had emphasized the minority shareholders'

right to purchase the debtor's interest for $1.00 in the event of a material breach, the panel

characterized the purchase option as illusory, since  it would only "kick in" if the debtor were

terminated for cause, a "major decision" requiring a 75% vote (i.e., requiring the debtor's approval

for his own termination). *Id*. The court concluded:

> A Chief Operating Officer with 50% of the shares who cannot be removed for
> cause without his consent possesses a position of considerable ascendancy over
> the other shareholders. All of the decisions made in the ordinary course of busi-
> ness were [the debtor's] to make. All of the major decisions required [the
> debtor's] agreement. If [the debtor] abused this power, termination for cause
> was a tantalizing, but unavailable fiction. This shareholder's agreement was not
> a system of checks and balances. [The debtor] had more knowledge, and sub-

-28-

stantially more power, than appellants.

In this case, a fiduciary relationship was created *by the structure of the corpora-tion under the shareholder agreement*, which had given [the debtor] a position of ascendancy under our case law. ...

We conclude, therefore, that *based on the contract* [the debtor] possessed an ascendant position in relation to appellants. There was accordingly a fiduciary relationship for purposes of § 523(a)(4).

*Id.* at 1018-19 (emphasis added).

It thus appears that while a corporate officer and director can be - - contrary to Debtor's assertion - - a § 523(a)(4) fiduciary with respect to a shareholder who is also a director, the debtor's status of office alone may not necessarily require that conclusion. *See also In re Haughey*, 2005 WL 3077227, at *5 (Bankr. N.D.Ill. Nov. 15, 2005) (while corporate officer can be fiduciary under § 523(a)(4), that determination requires court to make factual analysis of corporation's structure and operations (citing *Frain*)); *but see, e.g., Meyer v. Rigdon*, 36 F.3d 1375, 1382 (7th Cir. 1994) (finding debtor a fiduciary for purposes of § 523(a)(4) based on officer/director status); *In re Volpert*, 175 B.R. 247, 260 (Bankr.N.D.Ill.1994).

Again, Plaintiffs here allege that Debtor, "as an officer and director of Hellenic owed a fiduciary duty to Hellenic and to Antoniou, as a shareholder." Complaint, ¶ 42. While this allegation is clearly sufficient to withstand a motion to dismiss Count II as to Hellenic,[20] there is some question as to its sufficiency with respect to Antoniou, particularly in light of Plaintiffs' further allegation that Debtor and Antoniou had agreed to proceed as equal partners. Moreover, while Plaintiffs allege that Antoniou and Debtor had "agreed to form a corporation for each individual

---

[20]     It can hardly be questioned that Hellenic, a corporation, was "incapable of monitoring the [debtor's] performance of his undertaking," rendering the relation inherently one between unequals. *See Marchiando*, 13 F.3d at 1116.

store that they would acquire, with each of them owning an equal beneficial ownership interest"

therein, Complaint, ¶ 10, Plaintiffs do not specifically allege what percentage of stock was ultimately

issued to Debtor or to Antoniou or what offices they held.  Plaintiffs simply allege that Hellenic was

formed, "with [Debtor] and Antoniou as the sole officers, directors and shareholders ..." Complaint,

¶ 11.  As indicated above, while federal notice pleading generally does not require detailed factual

allegations, Plaintiffs must nonetheless plead "enough facts to state a claim for relief that is plausible

on its face." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (citing

*Bell Atlantic*).  Under the circumstances, the court does not believe that Plaintiffs have crossed the

plausibility threshold with respect to the § 523(a)(4) cause of action against Antoniou.


## CONCLUSION

For all of the reasons set forth above, Debtor's motion to dismiss is granted, but only with

respect to Plaintiff Antoniou as to Count II; the motion is denied in all other respects.  A separate

order will be entered to that effect, which will also set a status hearing for June 23, 2009 at 10:30

a.m. and fix a deadline of June 17, 2009 for Debtor to answer the Second Amended Complaint.

Dated: 5-15-2009

ENTER:

Susan Pierson Sonderby
United States Bankruptcy Judge

-30-